[Cite as *C.V. v. Ullom*, 2026-Ohio-967.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| C.V. | Case No. 2025 CA 00060 |
| Petitioner - Appellee | <u>Opinion And Judgment Entry</u> |
| -vs- | Appeal from the Court of Common Pleas, Case No. 23CV001276 |
| GARY ULLOM | Judgment:   Affirmed |
| Respondent – Appellant | Date of Judgment Entry:  March 19, 2026 |

**BEFORE:** Andrew J. King; William B. Hoffman; David M. Gormley, Appellate Judges

**APPEARANCES:** MAX SUTTON, for Plaintiff-Appellee; SAMUEL H. SHAMANSKY, DONALD L. REGENSBURGER, ASHTON C. GAITANOS, for Defendant-Appellant.

*King, P.J.*

{¶ 1}   Respondent-Appellant Gary Ullom appeals the May 1, 2024 judgment of the Licking County Court of Common Pleas which granted Petitioner-Appellee C.V.'s November 8, 2023 Petition for a Civil Stalking Protection Order. We affirm the trial court.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   This matter involves Ullom's behavior towards two neighbors, C.V. and his family and T.D. and her family.

{¶ 3}   Ullom and C.V. are neighbors residing in Newark, Ohio. C.V. and his family live across the street from Ullom. They have been neighbors for more than 15 years. In the years leading up to C.V.'s petition for a protection order, their relationship had deteriorated. Ullom and T.D. are also neighbors. T.D.'s home in next to Ullom's. Due to

concerns similar to those of C.V., T.D. also filed a petition for a protection order on November 8, 2023. The facts of each matter overlap.

{¶ 4} The incident that caused each petitioner to request a protection order took place on November 7, 2023. On that day, Ullom became angry with T.D. for allegedly blowing debris onto the side of his freshly power washed house. Ullom contacted his friend and neighbor of 30 years, R.C. Appellant told R.C. he was angry about the incident with T.D. and wanted to "take some neighbors out." He also made threats of "suicide by cop." Transcript of Trial (T.) at 40. While R.C. alleged he did not think appellant would carry out the threats, he was concerned enough to make a call to a family member of T.D. to warn her and C.V.'s family of the threat. This warning, in turn prompted a call to the Sherriff's Department. Ullom was ultimately transported to Licking Memorial Hospital due to his threat of suicide, and was also charged with aggravated menacing.

{¶ 5} Events leading up to C.V.'s petition began in 2011 when Ullom fired a gun inside his home which sent a bullet across the street into C.V.'s home and into drywall directly above where his wife, J.V. and their child were lying on the sofa. While the parties agreed this was an accidental discharge, later events caused appellee to fear for the safety of himself and his family, particularly given appellant's access to and reckless handling of firearms.

{¶ 6} In 2021, J.V. witnessed Ullom screaming at his wife in the front yard. She immediately went inside and shut the door, but could still hear Ullom screaming. She further witnessed Ullom shooting at dogs and cats that would enter his yard.

{¶ 7} In summer of 2022, T.D. was having a graduation party for her son. During the party appellant became angry about a car parked on his property. C.V. heard

appellant yelling about the matter. T.D. had the car moved and believed that ended the matter. But shortly thereafter, Ullom started shooting his guns outside in his yard. C.V. heard the gunshots. When questioned by T.D., appellant retorted "you don't know who you're fucking with" and reached for his hip where he often had a gun tucked into the waistband of his pants. The Sheriff's Department became involved and addressed the matter with Ullom. Ullom then erected a sign in his yard which read "Someone lied! Making false reports to the Licking County Sheriff is a crime." Petitioner's Exhibit 5.

{¶ 8} During summer, 2023 Ullom became angry about a comment C.V. made on social media. He texted C.V. "I never thought about the two-faced cowards I have for neighbors." Then at 1:30 a.m. Ullom texted "It's no wonder you have a $600 electric bill. It's 1:30 a.m. and all the lights on isn't helping.

{¶ 9} The same summer, Ullom would routinely yell profanities at C.V. as he went into or out of his home. C.V. would not respond.

{¶ 10} In September 2023, Ullom made a post on the Madison Township Facebook page stating he had been disrespected by "spoiled brats and cowards (my neighbors)" and further posted "obviously he's afraid of the old man." Petitioner's Exhibit F.

{¶ 11} Following the November 7, 2023 incident, the trial court issued an ex parte civil stalking protection order (CSPO) and set the matter for an evidentiary hearing on December 19, 2023.

{¶ 12} Ullom requested and received two continuances which moved the final hearing to March 1, 2024. On that date, C.V., who was acting pro se, asked that the hearing be continued so that he could reissue subpoenas. He was unaware that he

needed to reissue subpoenas after each continuance. The magistrate granted the request and set the final hearing for April 4, 2024.

{¶ 13} Before the hearing began, the magistrate ruled the C.V. and T.D. hearings would be consolidated as the witness lists were the same.

{¶ 14} After hearing the evidence and taking the matter under consideration, on May 1, 2024, the magistrate issued a CSPO designating C.V. and J.V. as protected parties.

{¶ 15} On May 15, 2024, Ullom filed objections to the magistrate's decision and filed supplemental objections on December 25, 2024. On July 15, 2025, the trial court denied Ullom's objections.

{¶ 16} Ullom filed an appeal and the matter is now before this court for consideration. He raises six assignments of error as follows:

I

{¶ 17} "THE TRIAL COURT'S ISSUANCE OF A CSPO WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION"

II

{¶ 18} "THE TRIAL COURT REPEATEDLY ALLOWED APPELLEE TO ELICIT PREJUDICIAL AND INADMISSIBLE HEARSAY IN VIOLATION OF THE OHIO RULES OF EVIDENCE, THEREBY DEPRIVING APPELLANT OF HIS RIGHTS TO DUE PROCESS AND FUNDAMENTAL FAIRNESS AS GUARANTEED BY THE FIFTH AND

FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION."

III

{¶ 19} "THE TRIAL COURT'S ISSUANCE OF A CSPO WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION"

IV

{¶ 20} "THE TRIAL COURT FAILED TO APPLY THE APPROPRIATE LEGAL STANDARD IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION."

V

{¶ 21} "THE TRIAL COURT ABUSED ITS DISCRETION BY CONSOLIDATING THE C.*V* CASE WITH THE T.*D* CASE MID-HEARING, THEREBY VIOLATING APPELLANT'S RIGHT TO DUE PROCESS AND FUNDAMENTAL FAIRNESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION."

VI

{¶ 22} "THE TRIAL COURT'S CONTINUANCE OF THE FINAL HEARING IN THIS CASE CONSTITUTED AN ABUSE OF DISCRETION WHICH RESULTED IN PREJUDICE TO APPELLANT."

I, III, IV

{¶ 23} For ease of discussion, we address Ullom's first, third, and fourth assignments of error together. In his first assignment of error, Ullom argues the issuance of a CSPO is not supported by sufficient evidence. In his third assignment of error, he argues the issuance of a CSPO is against the manifest weight of the evidence. In his fourth assignment of error, Ullom accuses the trial court of crafting a new legal standard when it determined Ullom knowingly engaged in a pattern of conduct that caused C.V. to believe he would be physically harmed. According to Ullom, apprehension of harm or distress is insufficient. We disagree with each of these arguments.

Standard of Review

{¶ 24} When the appellant asserts that there was not a preponderance of competent, credible evidence to support the CSPO, our standard of review is whether there was sufficient, credible evidence to support a finding that the respondent engaged in acts of menacing by stalking. *S.M. v. T.G.*, 2025-Ohio-1448, ¶ 26 (8th Dist.)

{¶ 25} Sufficiency of the evidence "is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict [decision] is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Weight of the evidence concerns "the inclination of the greater amount of credible evidence" supporting one side over the other. *Eastley v. Volkman*, 2012-Ohio-2179 ¶ 12, applying *State v. Thompkins*, 1997-Ohio-52. We must

not substitute our judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Eastley v. Volkman*, 2012-Ohio-2179. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison*, 49 Ohio St.3d 182, 189 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997).

Civil Stalking Protection Orders

{¶ 26} A civil staking protection order "is a special statutory remedy that is designed to prevent violence." *Bey v. Rasawehr*, 2020-Ohio-3301 ¶ 16. "To be entitled to a civil stalking protection order, a petitioner must show, by a preponderance of the evidence that the respondent engaged in menacing by stalking, a violation of R.C. 2903.11, against the person seeking the order." *Tumblin v. Jackson*, 2006-Ohio-3270 (5th Dist.). "Preponderance of the evidence" is "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not." Black's Law Dictionary 1182 (6th Ed. 1990).

{¶ 27} R.C. 2903.211(A), menacing by stalking provides in relevant part:

(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family

or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:

(a) Violate division (A)(1) of this section;

. . .

{¶ 28} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). Whether a person acts knowingly can only be determined, absent a defendant's admission, from all the surrounding facts

and circumstances, including the doing of the act itself. *State v. Jacobs*, 2021-Ohio-1611, ¶ 16 (5th Dist.) citing *State v. Huff*, 145 Ohio App.3d 555, 563 (1st Dist. 2001).

{¶ 29} A "pattern of conduct" is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). "'In determining what constitutes a pattern of conduct, courts must take every action of the respondent into consideration, even if some of the actions in isolation do not seem particularly threatening.'" *R.W.B. v. T.V.*, 2024-Ohio-584, ¶ 15 (8th Dist.), quoting *Lewis v. Jacobs*, 2013-Ohio-3461, ¶ 10 (2d Dist.).

{¶ 30} R.C. 2903.211(D)(2) states:

> (2) "Mental distress" means any of the following:
>
> (a) Any mental illness or condition that involves some temporary substantial incapacity;
>
> (b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

{¶ 31} Mental distress need not be incapacitating or debilitating, and expert testimony is not required. *Rufener v. Hutson*, 2012-Ohio-5061 (8th Dist.); *Jenkins v. Jenkins*, 2007-Ohio-422 (10th Dist.). Contrary to Ullom's assertion that apprehension of

physical harm is insufficient to establish menacing by stalking, in *Z.J. v. R.M.*, 2023-Ohio-3552 (5th Dist.) this court found the statute does not require that the victim actually experience mental distress or physical harm, but only that the victim believes the stalker will cause mental distress or physical harm. *Id.* ¶11. Recognizing a conflict with our holding in *Z.J.* and holdings in decisions in the Fourth, Seventh, and Ninth Districts, which found a victim must actually experience mental distress, this court entered an order certifying a conflict. No. 2022 CA 0071 (5th Dist. Mar. 4, 2024).

{¶ 32} The Supreme Court of Ohio agreed that a conflict existed and ordered the parties to brief the conflict question certified by this court: "'Whether R.C. 2903.211(A)(1) requires a victim to actually experience mental distress or only believe that the stalker will cause the victim physical harm or mental distress, for a court to issue a civil stalking protection order.'" *Z.J. v. R.M.*, 2024-Ohio-1507, quoting No. 2022 CA 0071, at 7 (5th Dist. Mar. 4, 2024). The Court affirmed this court's interpretation of the statute and held "that a petitioner's belief that an offender will cause him mental distress is grounds for showing a violation of the menacing-by-stalking statute to obtain a civil stalking protection order." *Z.J. v. R.M*, 2025-Ohio-5662, ¶3.

{¶ 33} In evaluating a claim of mental distress, an objective standard is to be applied to the impact upon a victim's state of mind as it relates to threatening communications. *Fleckner v. Fleckner*, 2008-Ohio-4000 (10th Dist.).

Analysis

{¶ 34} Here, C.V. and his wife J.V. testified to an escalating course of conduct by Ullom cumulating in his threats of November 7, 2023 to take his own life as well as those of his neighbors.

{¶ 35} The incidents began in 2011 when Ullom fired a gun in his own home sending a projectile through the home of C.V. and J.V., narrowly missing J.V. and her son, then exiting the home and coming to rest in a neighbor's swimming pool. Transcript of trial (T.) 94. While both C.V. and J.V. believed this incident involved an accidental misfire, it became a basis for concern regarding how Ullom handled firearms and himself given the events that followed, and the gradual deterioration of their relationship with Ullom. T. 124-125.

{¶ 36} In 2022 J.V. witnessed Ullom as he became aggressive with his wife while the two were in their front yard. Ullom was screaming profanities at his wife because he disapproved of how she was mowing the yard. Ullom's behavior was so aggressive that J.V. felt the need to retreat into her home and shut her garage door. The same year, J.V. witnessed Ullom shooting at his cat in his front yard. In a separate incident that year, she witnessed Ullom shooting at a neighbor's dogs when they entered his front yard. This also concerned J.V. as the homes on their shared lane are close together. T. 99 -102.

{¶ 37} In July 2023, J.V. heard Ullom screaming at C.V. as C.V. returned home from work. Ullom was angry about something C.V. had posted on Facebook and was calling him a "pussy" and a "keyboard warrior." T. 116. On July 3, 2023, Ullom texted C.V. at 1:30 a.m. calling him and J.V. "two-faced cowards." He further felt the need to text C.V about all the lights on in C.V.'s home at 1:30 a.m. Petitioner's Exhibit E. Thereafter Ullom would routinely hurl insults at C.V. anytime he was outside his home, attempting to bait him into confrontation. C.V.'s young son was present during some of these incidents. T. 133. In these situations, C.V. stated: "My whole goal is not to escalate any situation. I've

seen it, how quickly things can escalate with [Ullom]. T. 133. C.V. also witnessed Ullom behaving in the same manner towards his neighbor. T.D. *Id*.

{¶ 38} On September 14, 2023, Ullom posted on the "Madison Township Event, Licking County, Newark Ohio" Facebook page stating he had been disrespected by "spoiled brats and cowards (my neighbors)" Ullom further stated "I am not the convicted felon but my neighbor, attempting to get elected to the school board is." Ullom concluded his post with "Obviously he is afraid of the old man." Petitioner's Exhibit F.

{¶ 39} At the protection-order hearing, C.V. testified about the mental distress that he felt on November 7, 2023, which was when he learned about Ullom's threats to take out some neighbors and kill himself. C.V. testified:

> I was very fearful for my children that night. If Mr. Ullom had come out of the door of his home, I would have sprinted across the yard if I thought for an instant he was going to come back outside. I was glad the situation was deescalated without any a – any incident. But I can't tell you I knew what was going to happen that way. I didn't know what was going to happen. You know, all these incidents, you know, as one don't seem like very much. As they built and built, my opinion of the defendant became one of more and more of this guy could be dangerous. And that made me more and more uneasy. And when I heard the alleged threats that he made that night, that's when it became clear to me that Mr. Ullom could indeed be a very, very real threat to myself and my family. Mr. Ullom had repeatedly

expressed his displeasure with me defending [T.D.'s family] in any such way, in anyway whatsoever from any . . .confrontation we've had. . . .I have in my mind no doubts that when he refers to neighbors as wanting to take them out, he's referring to myself, my family, and [T.D.'s] family.

{¶ 40} T. 135-136.

{¶ 41} C.V's wife, J.V., also testified that based on Ullom's prior behavior, she too was frightened for herself and her children on the evening of November 7, 2023. T. 102-103. While she and C.V. were across the street warning another neighbor of the threat, J.V. advised her children to remain locked inside their home. She was afraid to walk back to her home before deputies arrived because she feared Ullom was armed and she would be shot. *Id*.

{¶ 42} Thus, both C.V. and J.V. testified they experienced mental distress due to Ullom's escalating behaviors and feared physical harm would follow. This is sufficient evidence to establish menacing by stalking.

{¶ 43} Ullom argues he did not act with the requisite mental state as he never directly threatened C.V. and his family and there is no evidence that he was aware that his discussion with R.C. would be relayed to C.V. and T.D. Yet as noted above, one "acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Telling one neighbor you wish to "take out" other neighbors and then commit "suicide by cop," will probably cause that neighbor to alert those potentially in harm's way.

{¶ 44} Additionally, as the Ninth District Court of Appeals has found, "R.C. 2903.211(A)(1) does not require proof that the offender explicitly threatened the victim." *M.B. v. L.D.*, 2023-Ohio-3560, ¶ 17 (9th Dist.). "'Instead, the offender's knowledge that the conduct will result in the victim fearing physical harm or suffering mental distress can be inferred by the circumstances.'" *Id*., quoting *State v. Smith*, 2012-Ohio-335, ¶ 20 (9th Dist.). Ullom posted his knowledge that C.V. feared him on Facebook. Petitioner's Exhibit F.

{¶ 45} Ullom also takes issue with the trial court's consideration of the testimony regarding the 2011 and 2022 incidents as too remote in time. "Because the statute does not specifically state what constitutes incidents "closely related in time," whether the incidents in question were "closely related in time" should be resolved by the trier of fact "considering the evidence in the context of all the circumstances of the case." *State v. Honeycutt*, 2002 Ohio 3490, ¶26 (2d District).

{¶ 46} Here, the 2011 and 2022 incidents provided context to the incidents of summer and late fall of 2023 which were closely related in time. The "context" a court considers is not limited to the incidents which were "closely related in time." *Middletown v. Jones*, 2006-Ohio-3465, ¶ 11 (12th Dist.).

{¶ 47} Finally, Ullom argues the trial court's decision is against the manifest weight of the evidence. In support of his argument, he points to the testimony of R.C. which he characterizes as too contradictory to be of any evidentiary value.

{¶ 48} We first note that even on a cold transcript, it is apparent R.C. was evasive and less than cooperative during the hearing. He did, however, testify he took steps to

alert T.D. and C.V. "just to be sure everybody's going to be safe." T. 84. He was therefore concerned enough by Ullom's statements to take proactive steps.

{¶ 49} Ullom additionally argues R.C. testified he found nothing alarming about Ullom's statements because he "talks like that all the time." But whether or not R.C. found Ullom's statements alarming is not relevant to whether C.V. and his wife J.V. experienced mental distress or feared physical harm based on the same statements as R.C. was not the party seeking a CSPO.

{¶ 50} Ullom has failed to show the trial court granted the CSPO against the manifest weight of the evidence. C.V. provided competent, credible evidence that Ullom engaged in a pattern of conduct which satisfied the requirements of R.C. 2903.211(A) and 2903.211(D). Accordingly, Ullom's first, third, and fourth assignments of error are overruled.

II

{¶ 51} In his second assignment of error, Ullom alleges the magistrate erroneously admitted hearsay statements which denied him due process and a fair trial. We disagree.

Bench Trial

{¶ 52} We begin by noting Ullom's case was tried to the bench. "We must presume, in reviewing a bench trial, that the trial court considered nothing but relevant and competent evidence in reaching its verdict. 'The presumption may be overcome only by an affirmative showing to the contrary by the appellant.' " *State v. Mackey*, 2014-Ohio-2288, ¶ 8 (5th Dist.) citing *State v. Wiles*, 59 Ohio St.3d 71 (1991). In a bench trial, the trial court acts as a factfinder and "is presumed to be able to sort out the irrelevant and prejudicial evidence from that which was probative and admissible." *State v. Parker*,

2002-Ohio-2688, ¶ 20 (8th Dist.). In fact, during this hearing, after numerous objections based on hearsay and relevance, the trial court advised counsel for Ullom "Okay, well look, I know how to take what information is relevant and appropriate. You don't need to object to everything. . . I also know what's relevant and what's not and will make that determination when I make my decision." T. 164-165.

Ullom's Hearsay Complaints

{¶ 53} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).

{¶ 54} First, Ullom takes issue with "layers of hearsay" testimony related to how C.V. learned Ullom had made threats of harm on November 7, 2023. According to Ullom, neither the responding officers nor the petitioners heard any threats directly from him, and therefore any testimony regarding his statements was inadmissible hearsay.

{¶ 55} The record reflects that Ullom made his statements to R.C. R.C. then spoke to both the responding officers and T.D. about Ullom's statements. T. 52, 163. R.C testified at the CSPO hearing regarding the threats Ullom made and was cross-examined by counsel for Ullom. Ullom's own statements to R.C. are simply not hearsay. Evid.R. 801(D)(2)(a).

{¶ 56} Next, as to the testimony of the responding officers, "Ohio courts have long held that out-of-court statements are admissible to explain the actions of a police officer during an investigation and are not hearsay." *State v. Johnson*, 2018-Ohio-1389, ¶ 44 (8th Dist.), citing *State v. Davis*, 2008-Ohio-2. Both Deputy Buehler and Deputy Riddle spoke directly to R.C. regarding Ullom's statements indicating he wished to harm himself

and "take some neighbors with him." T. 40, 52. Based on these reports, the deputies eventually located Ullom, and transported him to the Licking Memorial Hospital for treatment. T. 35-36. Their testimony, therefore, explained the actions of the deputies based on the reports of R.C. and the petitioners. At worst, the testimony of the responding deputies and the petitioners regarding the threats was cumulative to R.C.'s testimony. Even assuming arguendo, the admission of the deputies' testimony was erroneous, "the erroneous admission or exclusion of hearsay, cumulative to properly admitted testimony, constitutes harmless error." *State v. Hogg*, 2011-Ohio-6454, ¶ 46 (10th Dist.).

{¶ 57} Third, Ullom argues the trial court erroneously admitted a police report replete with inadmissible hearsay into evidence. In support of his argument, Ullom cites to this court's decision on *State v. Granderson,* 2008-Ohio-3757 (5th Dist.) wherein we noted that police reports are generally inadmissible hearsay *and should not be submitted to a jury. Id*. at 435, emphasis added. But as discussed above, this was a trial to the bench. Moreover, we have reviewed the judgment entry granting the CSPO and note that it contains no mention of the police report as a basis for granting C.V.'s petition.

{¶ 58} Next, Ullom makes a passing reference to hearsay evidence admitted in violation of his rights under the Confrontation Clause. Ullom fails, however to provide a clue as to which witnesses this argument applies to. "It is not the duty of this Court to develop an argument in support of an assignment of error if one exists." *State v. Untied*, 2007-Ohio-1804, ¶ 141. Consequently, we may disregard arguments if an appellant fails to identify the relevant portions of the record upon which he bases his argument. See App.R. 12(A)(2).

{¶ 59} Finally, we note counsel for Ullom has made disparaging remarks throughout his brief against the trial court in this matter including accusing the court of bias, providing legal advice to pro se parties, crafting its own legal standards, and lacking in a fundamental understanding of the hearsay rules. Appellant's brief at 20-21, 24, 27. We would caution counsel against making such comments about any tribunal, particularly when the misunderstanding here appears to lie with counsel.

{¶ 60} Ullom has failed to overcome the presumption that the trial court considered only relevant competent evidence in reaching its verdict. Accordingly, Ullom's hearsay arguments are without merit and the second assignment of error is overruled.

V

{¶ 61} In his fifth assignment of error, Ullom argues the trial court abused its discretion in consolidating the C.V. and T.D. cases into one trial. We disagree.

{¶ 62} Civ.R. 42(A)(1)(a) provides that "If actions before the court involve common questions of law or fact, the court may . . . join for . . . trial any and all matters at issue in the actions." The decision to consolidate or join cases for trial under Civ.R. 42(A) rests within the discretion of the trial court, and the trial court's decision will not be reversed on appeal absent an abuse of discretion. *Siuda v. Howard*, 2002-Ohio-2292, ¶ 10 (1st Dist.). When deciding whether to join cases for trial, the trial court "must determine if there is a sufficient commonality of issues and parties to warrant consolidating the cases for trial. *Id.*

{¶ 63} "Abuse of discretion" means an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). Most instances of abuse of discretion will result in decisions that are simply unreasonable,

rather than decisions that are unconscionable or arbitrary. *AAAA Ent., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161 (1990). An unreasonable decision is one backed by no sound reasoning process that would support that decision. *Id*. "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id*.

{¶ 64} In the instant matter, the facts of the two cases were nearly identical, each required the same witnesses, and the questions of law in each matter were identical. While Ullom argues the consolidation deprived him of a fair opportunity to prepare and respond, he does not explain how. Indeed, due to the parallel facts and witnesses of each matter, if counsel for Ullom was prepared for one case, he was prepared for both. He further alleges consolidation created confusion as to what evidence could be considered in each matter. But once again, this was a trial to the bench and it is therefore presumed that the trial court was able to sort out the irrelevant and prejudicial evidence from that which was probative and admissible in each case. *State v. Parker*, 2002-Ohio-2688, ¶ 20 (8th Dist.).

{¶ 65} The fifth assignment of error is overruled.

VI

{¶ 66} In his final assignment of error, Ullom argues the trial court abused its discretion when it granted petitioner C.V.'s request for a continuance. We disagree.

{¶ 67} The grant or denial of a continuance rests within the trial court's sound discretion. *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). In determining whether a trial court abused its discretion in denying a motion for a continuance, an appellate court

should consider the following factors: (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to witnesses, opposing counsel, and the court; (4) whether there is a legitimate reason for the continuance; (5) whether the defendant contributed to the circumstances giving rise to the need for the continuance, and other relevant factors, depending on the unique facts of each case. *Unger*, supra, at 67-68, 423 N.E.2d 1078. The reviewing court must also weigh the potential prejudice to the movant against the trial court's right to control its own docket. *In re Barnick,* 2007-Ohio-1720, ¶ 10 (8th Dist.), citing *Unger*.

{¶ 68} Here, C.V. testified in his own case first. When he began discussing what he was told by officers on November 7, 2023, Ullom objected based on hearsay. T. 12. C.V. who was proceeding pro se, indicated he had issued subpoenas before the originally scheduled hearing for the law enforcement officers involved to be present for the hearing and he assumed they were therefore present that day. However, Ullom twice requested and was granted continuances. C.V. stated he was under the impression that subpoenas automatically reissued when a continuance was granted. T. 14. When the trial court advised C.V. his assumption was incorrect, he requested a continuance in order to reissue the subpoenas and the trial court granted the same. Ullom objected stating "the witness has already been sworn in and we're here prepared to proceed." T. 15.

{¶ 69} Here on appeal, Ullom argues the trial court provided C.V. with "legal advice" which allowed C.V. to prepare admissible hearsay evidence. Brief of Appellant at 27. First, we have already found Ullom's hearsay arguments groundless. Second, we disagree with Ullom's characterization that the trial court provided legal advice to C.V.

Rather, in response to Ullom's hearsay objection, and after determining that C.V. did not reissue his subpoenas, the following conversation took place:

The Court: Okay, so you can't testify then to anything that a deputy stated that's – or anybody that's not here to testify to that statement. So that deputy would need to be here to testify. So, I'll sustain the objection based on hearsay in terms of what somebody told you.

[C.V.]: Okay.

The Court: But you can continue with your testimony, just you can't state what someone else told you.

[C.V.]: Okay, so I have to rethink my thoughts for just one second.

The Court: Okay.

[C.V]: I do have one quick question. I am assuming since this is already started, there is no way to postpone this hearing until we can reissue the subpoenas, right? Because I was not aware. We kind of – we thought they would be reissued since we got the new dates, we thought they would get the new dates also.

{¶ 70} T. 14-15.

{¶ 71} We find this conversation does not amount to "legal advice." Rather, the trial court made an evidentiary ruling. Moreover, the trial court never encouraged C.V. to seek a continuance. The record reflects Ullom requested and was granted two

continuances. We find no abuse of discretion in the trial court's decision to grant C.V.'s motion for a single continuance so that he could reissue subpoenas.

{¶ 72} The final assignment of error is overruled.

{¶ 73} For the reasons stated in our accompanying Opinion, the judgment of the Licking County Court of Common Pleas is affirmed.

{¶ 74} Costs to Appellant.

By: King, P.J.

Hoffman, J. and

Gormley, J. concur.